IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 19, 2019

## RACHEL KAY BOND v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Lawrence County**
**No. 34613     Stella L. Hargrove, Judge**

_____

**No. M2018-01324-CCA-R3-PC**

_____

The Petitioner, Rachel Kay Bond, appeals the Lawrence County Circuit Court's denial of post-conviction relief from her conviction of first degree murder.  On appeal, the Petitioner contends that she was denied the effective assistance of counsel based on trial counsel's failure to:  1) request a change of venue; 2) strike three potential jurors; 3) investigate the existence of text messages stored in the Petitioner's cell phone; 4) adequately cross-examine a witness; and 5) challenge the Petitioner's competency.  The Petitioner also alleges that trial counsel was ineffective because he allowed her to testify.  Following a review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and ROBERT L. HOLLOWAY, JR., JJ., joined.

Amy L. Schisler, Lawrenceburg, Tennessee, for the Appellant, Rachel Kay Bond.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Brent A. Cooper, District Attorney General; and Gary Howell and Christi Thompson, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

### FACTS AND PROCEDURAL BACKGROUND

The Petitioner was convicted of first degree murder of Mr. Robert Oscar Davis under a theory of criminal responsibility and was sentenced to life imprisonment. The evidence presented at trial established that the Petitioner was in a romantic relationship with the victim. The Petitioner maintained that the victim physically abused her, and the State presented evidence that she asked her friend, Mr. Ricky Houser, to "get rid of" the victim. Mr. Houser killed the victim. This court affirmed the Petitioner's conviction on direct appeal. *See State v. Rachel Kay Bond*, No. M2015-01433-CCA-R3-CD, 2016 WL 4548107, at *18 (Tenn. Crim. App. Aug. 31, 2016). In 2017, the Petitioner filed a petition requesting post-conviction relief. Following a hearing, the post-conviction court denied her relief. She now appeals.

## I. Trial

This court summarized the evidence present at trial as follows:

Benjamin Fisher, general manager at Schaffer's Muffler in Pulaski, Tennessee, testified that the victim was an employee at the muffler shop for approximately five and a half years. Mr. Fisher described the victim as a good and reliable employee. Mr. Fisher recalled the last time he saw the victim in May 2013. He said that it was a Thursday evening and the victim said, "I'll see you in the morning" as he left but that the victim never arrived at work the following morning.

Tim Nolen testified that the victim had been married to his sister and that he and the victim were "best friends." Mr. Nolen said that he and the victim were in daily contact and that the victim "texted everybody" with his cell phone. Mr. Nolen recalled that the victim visited his home on Thursday, May 2, 2013, in Anderson, Alabama after the victim finished work. The victim remained at Mr. Nolen's home until 2:00 or 2:30 a.m. The victim left because he was driving a 1968 Super Sport Chevelle that night and wanted to get the Chevelle "put up" before it began raining. Mr. Nolen said that the victim also drove a Chevrolet truck.

Mr. Nolen testified that the victim had planned to return to Mr. Nolen's residence at 5:30 a.m. to drive Mr. Nolen's truck to work. The victim lived five or six miles, a ten-minute drive, from Mr. Nolen's residence. Mr. Nolen never heard from the victim again after the victim left in the early morning hours of May 3. Mr. Nolen called and texted the victim throughout the day but received no response. At some point, Lawrence County law enforcement officers contacted Mr. Nolan to ask him questions about his last interaction with the victim.

Keith Wooten testified that he lived in West Point, Tennessee. He said that on school mornings he would drive his nephew to the school bus stop. On the drive to the bus stop he drove over Chisholm Creek Bridge. On Friday morning May 3, 2013, at 6:30 a.m., as he drove his nephew to the school bus stop, he noticed a red truck parked in a parking lot area next to the bridge. Keith Wooten thought it was odd that a vehicle would be parked there so early in the morning. He explained that normally trucks parked there to unload four-wheelers "for the day."

Bobby Wooten, Keith Wooten's father, testified that in May 2013 he noticed a red truck parked next to the creek near his home. He said the truck was "completely half hidden" and not the type of truck that would normally be in the parking lot. He explained that near the creek were motorcycle and four-wheeler trails, so trucks that pulled four wheelers often parked in that area. The red truck he observed on the morning of May 3, 2013, had "big chrome wheels" and "road tires" unlike the trucks that Bobby Wooten normally saw in that parking area. He recalled that the truck remained in that location for the entire weekend. When the truck was still there on Monday morning, Bobby Wooten stopped to inspect the truck. He said that, other than a flat front right tire, he noticed nothing unusual about the truck. Bobby Wooten wrote down the license tag number and asked his son, Keith Wooten, to "report the truck."

Adam Brewer, a Lawrence County Sheriff's Department deputy, testified that his department received a report that the victim was missing on May 6, 2013. The caller indicated that no one had been in contact with the victim since May 3, 2013. After confirming this with other relatives and acquaintances, Captain Brewer issued a "be on the lookout" ("BOLO") through dispatch. The victim's vehicle information was also entered into NCIC, a national database, in the event the victim was stopped in his vehicle. At some point, dispatch was advised of an abandoned vehicle in West Point, Tennessee, that was traced back to the victim.

Captain Brewer testified that the truck was towed to the impound lot and stored as evidence. He then requested a locator be placed on the victim's cell phone. Captain Brewer said an attempt was made but there was no service to the phone, so either the phone had been turned off or the phone was in an area with no service. The Sheriff's Department also made a request to the cell phone provider for the victim's cell phone records. Captain Brewer reviewed the records and found that the last contact with

- 3 -

the victim by phone was on Friday, May 3, 2013, at 4:58 a.m. with phone number [ending in 4741].

Captain Brewer testified that he then began investigating the person associated with the 4741 number. After learning that the number was an "Air Voice" number sold through a second party so that AT&T would be unable to provide subscriber information, Captain Brewer requested a locator for the cell phone number. After several attempts, Captain Brewer obtained a physical address associated with the number. The address, which was the [Petitioner's], was located on Second Creek Road in Lawrence County.

Captain Brewer testified that, on the evening of May 8, 2013, he and Lieutenant Neese went to the Second Creek Road address to speak with the [Petitioner]. Lieutenant Neese knocked on the front door while Captain Brewer walked around to the rear of the house "for safety reasons." Captain Brewer heard the bolt on the back door rattle and observed Rick Houser, wearing a motorcycle helmet, exit the residence. Captain Brewer stopped Mr. Houser and asked what he was doing. Mr. Houser acted suspiciously and finally answered, "I'm going to get bread." Due to his behavior, Captain Brewer asked for consent to search Mr. Houser's person for weapons. During the search, he found a small amount of marijuana and detained Mr. Houser at the front of the house.

Captain Brewer testified that the [Petitioner] and her two children were inside the residence. While he and Lieutenant Neese spoke to her about the victim's disappearance, she appeared very nonchalant until she mentioned that the victim had called her children "bastards." When she spoke of this, she became angry and "tensed up." While at the residence, Captain Brewer looked around the backyard and saw a large shed that had been recently used and noticed piles of toilet paper as if someone were using the shed as a bathroom. He explained that he thought this odd because the residence had indoor plumbing.

Captain Brewer testified that he and Lieutenant Neese collected both the [Petitioner's] and Mr. Houser's cell phones. The [Petitioner] confirmed that her cell phone number was [] the number that the phone records indicated had last made contact with the victim. Captain Brewer testified that, because the phones were "basic flip phones," little information could be gathered from the phones. He sent the victim's phone and "these" text messages to the Regional Organized Crime Information Center

("R.O.C.I.C."), an intelligence organization serving the southeast, for further analysis.

On cross-examination, Captain Brewer testified that he was familiar with the victim relevant to prior investigations of drug-related activity. Captain Brewer confirmed that he was aware of a police report on April 2, 2013, involving the victim as a trespasser on the [Petitioner's] property. Captain Brewer confirmed that he was also familiar with Mr. Houser, a "known drug associate." Captain Brewer stated that both Mr. Houser and the [Petitioner] were arrested at the [Petitioner's] residence on drug charges on May 8, 2013.

Jennifer Dalmida, a Verizon Wireless Executive Relations Analyst, testified that she also served as record custodian for Verizon. Ms. Dalmida confirmed that she received a subpoena from the Lawrence County Sheriff's Department regarding the records associated with the victim's cell phone number. Ms. Dalmida said that, in response, she provided the cell phone records for the victim's cell phone number, which included sent and received text messages, the text messages' content, call details, and subscriber information. The parameter for this information was from May 2, 2013 to May 3, 2013. Ms. Dalmida explained that the records for each subscriber were kept electronically in the normal course of business operations.

Carol Gilligan, an AT&T legal compliance analyst, testified that she received a request from the Lawrence County Sheriff's Department concerning specific cell phone records. Ms. Gilligan confirmed that the requested records were kept in the normal course of business. The two numbers, [] ("4741") and [] ("4802"), requested by the sheriff's department were both accounts sold through an entity other than AT&T, and AT&T provided only the service. As such, AT&T had access to the account activity but not the subscriber names. The two accounts were not AT&T customers but were using the AT&T network. Ms. Gilligan said that the time parameter for the 4802 account was May 6, 2013, to May 8, 2013. The time parameter for the 4741 account was May 2, 2013, to May 8, 2013, and the information compiled included both voice calls and text message transmissions. The text message transmission information did not include the actual text content.

Kristie Wixson, a Regional Organized Crime Information Center criminal intelligence analyst, testified that she worked in the Nashville,

Tennessee office. The Lawrence County Sheriff's Department requested assistance in a missing person case and, on July 1, 2014, she was assigned to assist the sheriff's department in the investigation. Lieutenant Neese provided her with telephone records for the victim, the [Petitioner], and Mr. Houser. Specifically, he requested cell tower mapping for the phone records.

Ms. Wixson testified that using the cell phone records and a mapping system she created a map for the cell phone usage of the [Petitioner's] phone and Mr. Houser's phone for May 3, 2013, from 12:00 a.m. to 9:00 a.m. She created a second map based upon the [Petitioner's] cell phone use from May 6, 2013, at 12:00 a.m., through May 8, at 12:07 a.m. She created another map for the [Petitioner's] cell phone use beginning May 2, 2013, at 8:00 a.m. through May 5 at 11:59 p.m. She created a fourth map showing the victim's cell phone activity on May 3, 2013, from 12:00 a.m. to 5:10 a.m. The last map Ms. Wixson created showed the combined activity for the [Petitioner], Mr. Houser, and the victim's cell phones on May 3, 2013, from 12:00 a.m. until 5:56 a.m.

Ms. Wixson testified that Lieutenant Neese also provided her with text messages from the victim's cell phone. Ms. Wixson said that from this information she compiled the text message information into a timeline that included the actual content of the messages.

Nathan Neese, a Lawrence County Sheriff's Department deputy, testified that on May 7, 2013, Captain Brewer notified him of a missing person report filed with the sheriff's department. First, Lieutenant Neese issued a BOLO to surrounding agencies with a description of the victim and his vehicle. As a result, another deputy notified Lieutenant Neese that a truck matching the description provided in the BOLO had been located near Pinkly Bridge. Lieutenant Neese and Captain Brewer went to West Point and confirmed that it was the victim's truck. Lieutenant Neese recalled that the truck had a flat tire, the right rearview mirror had been pushed in, and there were leaves around the window and mirror. He said that the vent window on the right passenger side door of the truck was open, but the truck doors were locked. Lieutenant Neese testified that he had the truck towed to the impound lot for storage pending further investigation of the missing person report.

Lieutenant Neese testified that he spoke with the victim's family about the victim's connection to the West Point area, and he learned that

the victim had "seen a female from that area." Based upon this information, Lieutenant Neese made contact with Felicia Fourakre, who had last seen the victim on May 1, 2013, at the [Petitioner's] residence in Five Points. Deputies then pursued possible leads related to cell phone records. The cell phone records indicated that the victim's last contact by phone was with the [Petitioner].

Lieutenant Neese testified that he also reviewed bank records in the course of his investigation. In so doing, he found that the victim's last purchase with his debit card was made on May 2, 2013, at 5:46 p.m. at a Wal-Mart in Pulaski, Tennessee. Lieutenant Neese obtained surveillance video from the Wal-Mart and confirmed that it was the victim who made the purchase at Wal-Mart on May 2. During this part of the investigation, Lieutenant Neese also learned of another cash purchase the victim made at a Walgreen's in Athens, Alabama, between 7:00 and 8:00 p.m. on May 2. Lieutenant Neese again spoke with family members to try to ascertain why the victim would have been in Athens, Alabama, and learned that some family members, specifically Timothy Nolen, lived in Anderson, Alabama. Lieutenant Neese met with Mr. Nolen who provided a statement consistent with his trial testimony.

Lieutenant Neese testified that he went to the victim's residence and confirmed that an orange Chevelle was parked in a shed, consistent with Mr. Nolen's statement about the [Petitioner's] taking the Chevelle home before the rain began. Lieutenant Neese described the shed where the Chevelle was parked as "a pretty tight spot" and recalled that family members told him that the victim was the only one who knew how to park the Chevelle in the shed due to the small space. The keys to the Chevelle were found inside the [Petitioner's] residence on an end table.

Lieutenant Neese testified that, on May 8, 2013, based upon information gathered from the victim's cell phone records, he and Captain Brewer went to the [Petitioner's] residence. He described the [Petitioner's] residence as a white, vinyl siding house with a wood front porch that sat "slightly up on a hill." He recalled that there was a wooden shed located to the back right of the residence and a second wooden "open-air" shed that sat further back behind the shed nearest to the residence. A well pump was located to the left of the back door. Lieutenant Neese introduced himself to the [Petitioner] and explained that he was conducting follow-up on a missing person. He recalled that one of the [Petitioner's] first questions to him was, "Have you found [the victim] yet?" The [Petitioner] did not

provide any information at the time but invited the deputies inside her home. While inside, the deputies found drugs and drug paraphernalia, and, as a result, the [Petitioner] and Mr. Houser were arrested.

Lieutenant Neese testified that he interviewed both the [Petitioner] and Mr. Houser at the sheriff's department following their arrests. After signing a *Miranda* waiver, the [Petitioner] gave a statement. Lieutenant Neese read the statement aloud as follows:

> [Q]uestion: What can you tell me about [the victim] missing?
>
> [Answer:] I told Ricky Houser about [the victim] putting his hands on me again. I told [Mr. Houser] that I wished [the victim] would just break up with me and stay away from me. I was unable to make [the victim] stay away from me because I loved him too much.
>
> [Mr. Houser] said that I did not deserve that and it needed to be took care of. I did not think [Mr. Houser] meant harming him or killing him. It's just not what you think about.
>
> [Mr. Houser] kept calling and checking on me. [Mr. Houser] was texting me, saying he needed to get ready for [the victim] to come over. [Mr. Houser] made that statement after I told [Mr. Houser] [the victim] was coming over.
>
> [The victim] texted me and I was texting him back. We was talking about watching a porn movie and having sex.
>
> I was peeing in the bathroom and I heard [the victim] pull up ... I heard [the victim] pull up to the house.
>
> While I was still in the house, I heard a loud smack, then another. And after that, I heard a loud painful moan and I knew it was [the victim's] voice. Then I heard more loud smacks over and over again.
>
> I got in the shower, after locking the bathroom door.
>
> [Mr. Houser] was in the house and was calling my name. [Mr. Houser] came to the bathroom door and said, "It's done,

- 8 -

girl. You don't have to be scared no more. That mother f**ker won't hit you again."

I asked him, "What did you do?"

And he said, "I took care of it."

I started to lose it and started to cry.

[Mr. Houser] walked away for a little while. Then [Mr. Houser] came back and started to bang on the bathroom door and told me I had to get out of the f** king bathroom. He said, "I got to talk to you."

I opened the door and [Mr. Houser] puts both hands on my shoulders. I asked him, "What did you do?"

[Mr. Houser] said, "It's okay. You don't have to be scared."

[Mr. Houser] kissed me on the forehead and said, "Don't worry about it."

[Mr. Houser] wanted me to [go] outside with him. [Mr. Houser] said "Come on, I want you to see this mother f**ker suffer."

I closed myself back in the bathroom. I went down and started crying.

[Mr. Houser] came back to the door a few times saying, "You have to hold it together. We are in this together."

I kept screaming, "I didn't want this. I loved him."

[Mr. Houser] told me we were in the same shoes. [Mr. Houser] said, "We have got to keep in touch."

I stayed in the bathroom and I heard the truck start up and the truck sits there running. Then the truck took off.

[Mr. Houser] waited a little bit and then texted me asking if I was okay. [Mr. Houser] texted me saying, "Hold it together. This is what you wanted."

I can't remember if he said this on a phone call or sent it in a text, but [Mr. Houser] said, "You should hear this mother f\*\*ker gurgling."

I asked him, "Why did you do that? What did you do?"

[Mr. Houser] said that it would be a better life for me and my kids. [Mr. Houser] again, making sure I was okay and holding it together. [Mr. Houser] texted me and said, "I got rid of it."

Then he said that he dropped off the truck and got 30 miles to walk. He was texting just casual conversation. [Mr. Houser] texted me and said, "About to get to the house."

And he said, "Am I going to be able to come over?"

I told him, "It would be okay."

I left my house and went to Nanner's (phonetic) house, which is Barry Williams.

Question: Do you know what Ricky Houser hit [the victim] with?

[Answer]: [Mr. Houser] told me he smacked [the victim] with a metal bat and he went down.

Question: Have you and [Mr. Houser] had conversation about what happened since it happened?

Answer: Yes.

Question: What was said in those conversations?

Answer: [Mr. Houser] would talk about [the victim] just dying and making a gurgling sound. [Mr. Houser] also said that he was hoping the coyotes would get him.

Question: Did [Mr. Houser] ever mention what he done with [the victim's] body?

Answer: [Mr. Houser] said that he put his body off of a horse trail, but no one would see him, but they might smell him. He said that he wouldn't go to him, because the limbs would smack them in the face. [Mr. Houser] said he laid [the victim] face down so he would not have to look at that ugly son of a b** ch.

Question: We went over your statement. You stated you made a mistake. What was that mistake?

Answer: [Mr. Houser] said that I was just as guilty as he was, not that we were in the same shoes.

Question: Is there anything you want to add or take away from this statement?

Answer: Not at this time. I felt like I had to do what [Mr. Houser] said or I would get hurt.

After speaking with the [Petitioner], Lieutenant Neese interviewed Mr. Houser who also provided a statement. Mr. Houser confirmed that the 4802 cell phone number was his number. He denied any knowledge about the victim or the victim's whereabouts. Mr. Houser acknowledged that he sent a text message to the [Petitioner] that said, "I got rid of it and I took care of your problem," but denied that this message related to the victim. Mr. Houser told law enforcement that he had known the [Petitioner] for eighteen years and that one of the [Petitioner's] daughters "should be his daughter." Mr. Houser became visibly upset when Lieutenant Neese asked if the victim had "terrorized" the [Petitioner] and her daughters. Mr. Houser stated that the [Petitioner] had told him that the victim had called the [Petitioner] a "dope whore" and her children "bastards." Lieutenant Neese said that, at this point, they took a small break to allow Mr. Houser to compose himself. When Mr. Houser indicated that he was "okay," questioning resumed.

Lieutenant Neese testified that he asked Mr. Houser about abandoning the victim's truck at the creek, and Mr. Houser responded, "[N]o one saw me walking West Point." Lieutenant Neese s[t]ated that, according to the [Petitioner], Mr. Houser had someone pick him up and drive him home after he abandoned the victim's truck. Mr. Houser expressed that he was nervous and "going to pass out." He stated that he could not account for his whereabouts on May 3 and asked for an attorney. Lieutenant Neese terminated the interview upon Mr. Houser's request for an attorney.

Lieutenant Neese testified that the [Petitioner] offered to take deputies to locations Mr. Houser frequented in an attempt to locate the victim's body. On May 10, 2013, the [Petitioner] directed the deputies to a cabin in an area called "the Granddaddy Field." This cabin was located "fairly close" to Mr. Houser's residence. On this same day, the [Petitioner] gave the deputies consent to search her residence. During the search, deputies collected a pillow case from a closet inside the residence. Lieutenant Neese said that he also photographed a note with various telephone numbers listed on it and a "hosepipe" attached to a water spigot on the outside of the [Petitioner's] house.

Lieutenant Neese testified that on May 11, 2013, Lieutenant Dean notified him that a body had been recovered "in the Bryant Boswell Road area." Lieutenant Neese described this area as in the western part of Lawrence County, between Lawrenceburg and West Point. When he arrived at the location where the victim's body was found, he saw "two arms sticking out from under a pile of what look[ed] to be cedar ... trees that are laid on the ground in a pile." Lieutenant Neese noticed several cedar sapling trees in the area that had been freshly cut down at the portion of the trunk close to the ground. Once law enforcement officers began removing the cedar trees placed over the body, Lieutenant Neese saw that the body was lying face down, missing a left shoe, and clothed in camouflage boxer shorts. He recalled that a black t-shirt was found between the victim's legs at his buttocks area. Lieutenant Neese observed a tattoo on the left arm that was later used for identification purposes in confirming that the deceased was the victim.

Lieutenant Neese testified that, when recovering items from the scene, he recognized the black Kevin Harvick racing t-shirt found between the victim's legs as the same shirt the victim had been wearing in the May

- 12 -

2, 2013 Walgreens surveillance video taken in Athens, Alabama. Lieutenant Neese said that he also recovered cut cedar saplings from the scene. On the trail that led down to the area where the victim's body was found, law enforcement officers found a king size fitted bed sheet. Lieutenant Neese testified that, following discovery of the body, the sheriff's department obtained a search warrant for the [Petitioner's] residence.

Lieutenant Neese testified that, during the investigation, Brandi Lewis, one of the [Petitioner's] family members, provided Lieutenant Neese with some incriminating text messages about the victim's murder. Lieutenant Neese also recalled that Mr. Houser contacted the Sheriff's Department and that he spoke with Mr. Houser again on October 21, 2014. Mr. Houser, with his attorney present, provided a statement and then accompanied law enforcement officers to various locations to corroborate his statement. He directed the deputies to the area of "Insurance Bluff," near where the victim's truck was found, and deputies recovered the victim's truck keys at Mr. Houser's direction.

On cross-examination, Lieutenant Neese testified that to "the naked eye" the king size fitted sheet and the pillow case recovered from the [Petitioner's] residence appeared to be the same color and were the same brand. He confirmed that no DNA was recovered from the fitted sheet.

Brandi Lewis, the [Petitioner's] cousin, testified that on May 31, 2013, she met with Investigator Neese and provided him with text messages from May 2013 that she had exchanged with the [Petitioner] about the victim's disappearance and death. Ms. Lewis confirmed that Lieutenant Neese had photographed some of the text messages stored on her cell phone. Ms. Lewis identified the photographs, confirming that the cell phone in the photograph belonged to her. Ms. Lewis identified a photograph of a text message the [Petitioner] had sent her on May 1, 2013, at 6:36 p.m. The [Petitioner's] attorney objected to the text messages being read aloud as hearsay. The trial court recognized the [Petitioner's] continuing objection to the text messages being read aloud but overruled the objection.

Ms. Lewis read the May 1, 2013 text messages aloud. The heading on each text message stated it was received from the [Petitioner]. The content of the messages received from the [Petitioner] on May 1, 2013 were as follows:

- 13 -

6:36 p.m.: Could you get rid of any of them things? My nerves are shot. [The victim] has been cause in me trouble. I had to call the law on him.

6:54 p.m.: Hit me, smack me, just 'cause I didn't want to be with him again. He's been up for four days on that dope and is thinking crazy. Told me I was a dope whore and my kids were bastards.

6:56 p.m.: Did it. You can do and say whatever to me. When it comes to my kids you're f**king up. You know, between you and me, I am going to do what needs to be done to him a long time ago.

6:59 p.m.: They wouldn't. They just told me to call them the next time he comes over, but he'll be gone before they can get here or I'll be dead, one. I've got men taking care of it.

6:59 p.m.: My hands will stay clean. I am making sure of it. I am smarter than he thinks I am.

7:10 p.m.: Oh, trust me; I tried to put him in jail. The cops said they wouldn't, not enough reason. But if I call the law, he is still here when they get here he'll go to jail. BS to me.

Ms. Lewis read a final message that had "Reply with copy [] 4741" across the top and then "My hands will stay clean. I am making sure of it. I am smarter than he thinks I am." The [Petitioner's] attorney objected to this last text message as repetitive of the 6:59 p.m. message. The trial court overruled the objection.

Ms. Lewis testified that she asked the [Petitioner] "if [the victim] was dead" in a text message she sent on May 8, 2013. Ms. Lewis did not receive a response to this question from the [Petitioner].

On cross-examination, Ms. Lewis testified that she was not concerned that "anything" was going to happen based upon the May 1 text message exchange with the [Petitioner]. She said that she had deleted the messages she sent to the [Petitioner] during the May 1 text exchange. Ms. Lewis could not remember when she deleted her responses but said that it

- 14 -

was before she went to the sheriff's department. Ms. Lewis agreed that she was concerned that "all of this" might somehow be traced back to her but stated that she had nothing to do with the victim's death and that she believed that the [Petitioner] did not as well.

On redirect examination, Ms. Lewis confirmed she had contacted the sheriff's department about the text messages after learning that the victim was dead, and the [Petitioner] had been arrested.

Casey Koza testified as an expert witness in the field of forensic serology. Ms. Koza stated that in 2013, she was employed as a forensic serologist for the Tennessee Bureau of Investigation ("TBI"). Ms. Koza recalled that she was assigned to test the victim's truck for DNA evidence. She described the truck as very muddy with mud marks on the inside of the truck as well. On the outside of the truck, Ms. Koza identified reddish-brown stains on the plastic bumper molding, along the metal trim of the truck where the bumper would sit, and on the side of the tailgate. On the inside of the truck, she identified staining on the door panel on the driver's side and the floorboard. She collected samples of the stains and then tested the samples to confirm whether the stains were human blood.

Ms. Koza testified that the test of the sample collected from the driver's side door panel inside the truck indicated the presence of blood, but, due the limited sample, she was unable to conduct additional testing to confirm that the sample was human blood. Ms. Koza took samples from the steering wheel, the gear shifter, and the driver's side floorboard, which all indicated the presence of blood. Ms. Koza tested the truck bed liner, and the test indicated the presence of blood on the interior of the bed liner; however, she could not do any further testing on the liner because she was unable to localize the stain on the dark liner. The samples taken from the tailgate indicated the presence of human blood.

Ms. Koza testified that she also tested samples taken from various items in the truck. The test results for a ball cap and a white napkin indicated the presence of blood, but due to the limited sample, she was unable to confirm that the blood was human blood. Likewise, a brown paper bag found in the bed of the truck indicated the presence of blood, but due to the limited sample Ms. Koza was unable to confirm that the sample was human blood.

Ms. Koza testified that she also received a black t-shirt from the Lawrence County Sheriff's Department. Ms. Koza conducted a presumptive test on the shirt and found the presence of blood. Due to the shirt being black, she was unable to localize a specific stain for further testing, so she took two "cuttings" from the front of the shirt and the back of the shirt to submit for further DNA testing.

David Hoover, a TBI latent fingerprint examiner, testified as an expert witness in the field of latent fingerprint analysis. Mr. Hoover testified that he processed the victim's 2001 red Chevrolet truck for latent fingerprints. Mr. Hoover found fingerprints that were "of value" for identification purposes, mostly on the windows of the truck. Mr. Hoover "matched" two of the prints to individuals: Timothy Wayne Gillespie and Heather Marie Nowlin. He stated that he also tested "numerous items" from inside the truck, one of which was a Sun Drop can found in a cup holder located in the front console of the truck. The fingerprint obtained from the can matched the [Petitioner's] fingerprint. Fingerprints were also obtained from a "Marlboro piece of paper" found on the dashboard of the truck. These prints were identified as the victim's prints.

Miranda Gaddes, a TBI forensic scientist in the Trace Evidence Unit, testified as an expert witness in the field of microanalysis and trace evidence. Ms. Gaddes testified that she compared a green sheet found at the location where the victim's body was found and a green pillowcase retrieved from the [Petitioner's] residence. She said the linens were similar in color and the same brand, but microscopically the construction of the fabrics were different.

Mike Turbeville, a TBI Forensic Biology Unit supervisor, testified as an expert witness in the field of serology and DNA analysis. Dr. Turbeville swabbed various areas of the 2001 red Chevrolet truck to obtain numerous DNA profiles, most of which matched the victim's DNA profile. A DNA profile located on the radio face inside the truck, however, matched the [Petitioner]. Dr. Turbeville noted that some of the profiles collected were mixtures containing DNA from three or more individuals. He explained that when this occurs, "it gets very complicated" and often results in inconclusive results as occurred with some of the samples collected from the truck.

Adele Lewis testified as an expert witness in the field of forensic pathology. Dr. Lewis testified that she performed the autopsy of the forty-

six-year-old victim on May 13, 2013. Dr. Lewis stated that the body was in a state[] of moderate to advanced decomposition with most of the skin on the face no longer present. Due to the decomposition, Dr. Lewis sought the help of a forensic anthropologist, Hugh Berryman. Based upon the examination of the body, Dr. Lewis concluded the cause of death was blunt force injuries to the head and the manner of death was homicide.

Hugh Berryman testified as an expert witness in the field of forensic anthropology. He testified that he examined the remains on May 20, 2013, at the request of the Medical Examiner's office. The bones from the cranium were in pieces and "highly fragmented." As he examined the skull bones he determined that some of the parts of the skull were missing. The "major areas missing" were the right upper part of the skull, the right lower part of the face, a portion of the left side cranial vault, and an area missing from the right parietal bone. In referencing photographs, Dr. Berryman noted a fracture to the jaw bone that was likely caused by blunt trauma. Based upon his reconstruction of the remains, Dr. Berryman opined as to the four impact sites on the victim's skull. The various fractures in the victim's bone structure were consistent with repeated blunt force trauma. He estimated that, although he identified four impact sites, the victim sustained "many more" blows to his head than four.

Ricky Houser testified that he was charged with the first degree premeditated murder of the victim and had entered an agreement with the State with regard to his charge. Mr. Houser was to plead guilty to second degree murder with a thirty-five year sentence in exchange for his truthful testimony at the [Petitioner's] trial.

Mr. Houser testified that, in May 2013, he lived on Mount Lebanon Road in Lawrence County. Mr. Houser identified the [Petitioner] in court and stated that he had known her for twelve to fourteen years. He said the two were "close friends" and romantically involved "[o]ff and on" during that time. Mr. Houser confirmed that he became aware in the spring of 2013 that the [Petitioner] was in a relationship with the victim. He did not know the victim, but the [Petitioner] spoke with him about the victim at the end of April 2013. He recalled that the conversations occurred over the phone and that most were text messages because the [Petitioner] lived in Five Points on "the other side of the [c]ounty." During these communications, the [Petitioner] told Mr. Houser that the victim was beating her "again." He said that she first told him of physical violence in February or March.

Mr. Houser testified that one night four or five days before the victim's murder, he went to the [Petitioner's] residence. Mr. Houser said that he waited outside the house in "a little old chicken coop" until the following morning when the [Petitioner's] children left for school. After the children left, he texted the [Petitioner] and asked if it was okay for him to come inside her residence before entering. The [Petitioner] told Mr. Houser that the victim beat and raped her and Mr. Houser saw bruising on the [Petitioner's] face. Mr. Houser recalled that, during this conversation, the [Petitioner] asked Mr. Houser to "get rid of [the victim]." Mr. Houser said that the [Petitioner] had already communicated this request by text before Mr. Houser arrived at the residence the night before.

Mr. Houser testified that he advised the [Petitioner] to call the police about the abuse but that the [Petitioner] refused this advice, explaining that she had called the police on two or three occasions and it did "no good." Mr. Houser said that the [Petitioner] told him that she had a restraining order against the victim but that he would come to her residence anyway. According to Mr. Houser, the [Petitioner] said that she had arranged for someone else to "get rid of" the victim, but they had "backed out on her." So, the [Petitioner] told Mr. Houser that she wanted Mr. Houser to "get rid of" the victim. When asked about his response to her request, he said, "She say, 'Jump.' I say, 'How high?'" Upon further questioning, he said that this had always been the nature of his relationship with the [Petitioner]. He stated that he had always loved the [Petitioner].

Mr. Houser testified that he agreed to "get rid of" the victim, but the two did not discuss any details. He said that he had packed clothing, a baseball bat, and a machete to take to the [Petitioner's] residence. Mr. Houser stayed at the [Petitioner's] property for the remainder of that week waiting for the victim to show up. The [Petitioner] had told Mr. Houser that the victim had come to her residence four or five times in the last couple of months, so they believed he would be back. The [Petitioner] said that the victim could show up "any random night" and often did so "real late." Mr. Houser said that he stayed outside when the [Petitioner's] children came home from school. He described the grass as chest high in the backyard, so it was "[p]retty easy to hide." Mr. Houser estimated that, while waiting for the victim to appear, he spent two or three nights outside, and he stayed inside one or two nights when the children were staying with a family member.

Mr. Houser testified that the baseball bat was silver and reflected the moon light at night. Due to his concern about detection, the [Petitioner] gave him black electrical tape, and he wrapped it around the bat one day while he was inside her residence.

Mr. Houser testified that one of the nights the [Petitioner's] children were away and both he and the [Petitioner] were inside the residence, the [Petitioner] received a text message at 3:00 or 4:00 a.m., and she said, "It's him." Upon learning this, Mr. Houser went outside because he "didn't want to sit [t]here and listen to her talking about getting with him." As he exited, he told the [Petitioner], "Get him in here." Mr. Houser said that he went outside with his bat and waited behind the shed that was closest to the residence for the victim to arrive.

Mr. Houser testified that he saw a red pickup truck pull in behind the [Petitioner's] house and behind the shed where he was waiting. Mr. Houser said that he approached the driver's side of the truck from the rear and "hollered" at the victim as he was exiting the truck. Mr. Houser noticed that the victim was dressed in his underwear and was holding a DVD player in his hand. The victim lunged at Mr. Houser, and Mr. Houser hit the victim in the forehead with the bat. Mr. Houser said that after he struck the victim, the victim fell to the ground. After the victim was lying flat on the ground, Mr. Houser hit the victim two more times on the side of the head. Mr. Houser estimated that he hit the victim between three and five times with the intention of killing the victim.

Mr. Houser testified that, after striking the victim, he tried to load him into the truck. He could not lift the victim so took a board from the shed and tried to slide the victim onto the board and then into the truck. He described the "board" as "an old door or something." He placed the "board" on the tailgate of the truck and used it as a ramp but still was unable to move the victim into the truck bed. When his attempts were unsuccessful, he went inside the residence to get the [Petitioner] to help him. The [Petitioner] was in the bathroom at the far end of the residence. Mr. Houser told the [Petitioner] to come out to help load the body, and the [Petitioner] joined him. On the way outside, the [Petitioner] retrieved gloves from under the kitchen sink for both her and Mr. Houser to wear while moving the body.

Mr. Houser testified that he and the [Petitioner] went outside, laid the "board" flat on the ground and then rolled the victim over onto the

- 19 -

"board." They then lifted the board up and placed it in the bed of the truck. Mr. Houser told the [Petitioner] to "clean up" and left her with his clothes to wash. He said that he also sprayed an area behind the shed with a water hose to wash away any blood that might have been on the ground. The [Petitioner] retrieved a "bluish" blanket from her closet, and the two covered the victim's body with it.

Mr. Houser testified that he did not know the area well, so he drove the victim's truck to an area in West Point that he knew. He recalled that the victim was still breathing when he left the [Petitioner's] house. The gas tank in the truck was low, so Mr. Houser stopped, approximately fifteen minutes from the [Petitioner's] house, at a gas station on Rabbit Trail Road. He purchased $6 of gas, all the money he had at the time, before proceeding to West Point. He noted that the blanket had blown off the victim, and the victim was no longer breathing during the gas station stop. Mr. Houser described the route he took after the gas station stop and stated that he communicated with the [Petitioner] via cell phone during the thirty to forty minute drive.

Mr. Houser testified that he "dumped" the body near a four-wheeler trail approximately 1,000 yards from the main road. He said the area was a thirty to forty-five minute walk from his home. Mr. Houser recalled that he dragged the victim's body into the woods and covered it with leaves and a few cedar trees that he cut down with the machete. He clarified that he may have covered the body with the trees the following day and not during the initial trip. Mr. Houser stated that, after leaving the body in the woods, the baseball bat, "board," and blanket remained in the bed of the truck. He said that he put the blanket in a "big mud hole" that was along the trail leading out to the area where he had left the body and ran over the blanket repeatedly to "mash" it down, thinking it would never be found. He also attempted to wash out the bed of the truck with muddy water from the mud hole.

Mr. Houser testified that he then returned to the main road with the … the baseball bat and drove to an area in West Point where there were four-wheeler trails. He could not recall the name of the area, but he described a concrete bridge with a gravel area where "everybody" parks. He said there was also a "big old creek," approximately seventy-five feet wide, that one could drive across. It was into this creek that Mr. Houser threw the bat and the DVD player. He also washed out the bed of the truck with the creek water using a white five-gallon paint bucket that he found in

the bed of the truck. Mr. Houser then locked up the truck, took the keys with him, and walked to his home.

Mr. Houser testified that it took him around five hours to walk home. On the walk, he hid the keys by a cedar tree along the road and threw the victim's emptied billfold over "Insurance Bluff." He said that he was still communicating with the [Petitioner] via text messages as he walked home. He returned to the area where he had left the body after midnight that night. He explained that he went back to the site on two occasions and could not recall what he did on each occasion. The first time he planned to dig a hole and bury the body but when he was unable to do so, he cut down small trees and placed them over the body.

Mr. Houser testified that the victim came to the [Petitioner's] residence in the early morning hours of Friday, May 3, 2013. After disposing of the victim's body, he spent Friday night away from the [Petitioner's] residence and then returned on Saturday, May 4. Mr. Houser explained that he borrowed his neighbor's motorcycle to drive to the [Petitioner's] residence. He remained there until the following Wednesday, May 8, 2013, when Lieutenant Neese and Captain Brewer came to the [Petitioner's] residence. Mr. Houser state[d] that, after disposing of the victim's body, he had returned to the [Petitioner's] residence, where he and the [Petitioner] spoke about what had occurred, and he told her where he had taken the victim's body.

Mr. Houser acknowledged that the toilet paper and "evidence of someone using the bathroom" in the shed behind the [Petitioner's] residence were from when he stayed in the chicken coop waiting for the victim. He said that he stayed up all night the three or four nights he waited in the chicken coop for the [Petitioner] and that he sent and received text messages during that time. He said that, during the day, he would sleep inside the [Petitioner's] residence. He said that he exchanged text messages with the [Petitioner] while in the chicken coop and also a friend of his named Derek Peters.

Mr. Houser testified that he had never assaulted anyone in a violent manner before the night at issue. When asked why he did this, he said, "Because she wanted me to. [The Petitioner], you know, asked me to do it." In retrospect he said he felt "not too good" about what he had done. Mr. Houser denied that, following this incident, the [Petitioner] ever told him that she did not want him to kill or hurt the victim. He said that she did

not ever express remorse in words but that he believed she was "upset about it" in the same way that this had affected him.

Mr. Houser described his mental state at the time he learned the victim was coming to the [Petitioner's] house as follows:

> I mean, we had been sitting there for four or five days. I—I was ready for it to end. ... I was trying to go home or get it over with; whatever happened, happened. Just, I'm through being—I'm tired of being here and just got to do something, you know. Good or bad, had to get it over with. I was so stressed out by then, I just wanted—it over with."

On cross-examination, Mr. Houser testified that when he was unable to load the victim's body into the truck by himself and he went inside to enlist the [Petitioner's] help, the [Petitioner] was hysterical and "shook up." He agreed that he told her if she did not come and help him load the body, he would just leave. The [Petitioner] told him that she did not know if she could do it, and he insisted that she had to help him. He further agreed that the [Petitioner] acted fearful of him the following day. He clarified that he was unsure of the exact sequence of events and that he may have gone directly into the house after he hit the victim, returned outside to try to load the victim into the truck, and then gone in the house a second time to enlist the [Petitioner's] help. He agreed the [Petitioner] was "freaking out." He denied, however, that she said to him, "What did you do? Why did you do it?" He agreed that he told the [Petitioner] that she needed to "come out here and watch him suffer," after he hit the victim with the baseball bat.

Mr. Houser testified that he left the [Petitioner's] house and drove approximately 100 yards away but then returned for gas money. He was unsure whether the [Petitioner] was standing outside when he left for the second time. Mr. Houser agreed that he and the [Petitioner] were doing drugs during the time he was at her residence waiting for the victim. He agreed that he felt the need to protect the [Petitioner] and believed the victim was "not a nice man." He further agreed that there was no specific plan in place for killing the victim.

On redirect examination, Mr. Houser testified that, during their subsequent communications, the [Petitioner] told him that she sprayed the grass with water until the well ran dry.

The [Petitioner] testified that she was thirty-four years old, and she had dropped out of school in the tenth grade. The [Petitioner] state[d] that she had met the victim five years before when they were introduced through Connie Davis. She said they began texting and then casually dating. She described most of the time they spent together as involving sex and smoking methamphetamine. She described the relationship as "drama" with a lot of fighting and then making up. She said that the victim choked and hit her but explained that she would get back together with him because she loved him. She further noted that he had "dope," and she "liked the sex," as her incentives to reconcile with the victim following their fights.

The [Petitioner] testified that, at the time of these events, she was addicted to methamphetamine and prescription medication. The [Petitioner] recalled an incident at the end of March or beginning of April in 2013, when the victim "almost" kicked her door in. As a result, she filed a police report, and a police officer told her that the victim would have to be present at her residence before law enforcement could get involved. She said that she and the victim reconciled on April 22 after the victim came to her house and spent the night. The following day, the victim left his methamphetamine at the [Petitioner's] residence, and the [Petitioner] smoked all of it. The [Petitioner] recalled that the victim was angry she had smoked his methamphetamine and hit her. After the victim left, the [Petitioner] called Mr. Houser and told him that the victim had hit her and asked him to "whoop [the victim's] butt." She said this phone conversation happened on a Monday night, and she invited Mr. Houser to her house, but he did not come until Thursday morning at around 6:00 a.m.

The [Petitioner] testified that the two smoked methamphetamine all day, and she "caught Mr. Houser up" on what was going on in her life. The [Petitioner] said that Mr. Houser had brought the drugs to her house at her request. The [Petitioner] denied asking Mr. Houser to kill the victim. She said that Mr. Houser agreed to "kick [the victim's] butt" because he was upset about the [Petitioner's] bruises.

The [Petitioner] agreed that she sent text messages to her cousin Brand[i] Lewis during this time period. She identified the printed text messages in court and confirmed that she had sent the messages. She stated that she sent a text message at 6:30 p.m. on May 1 to find out if Ms. Lewis had any Xanax. The [Petitioner] confirmed that she sent the text message stating, "I'm going to do what needs to be done to him a long time ago." She explained that she was angry that he had called her children bastards

- 23 -

and wanted "his butt kicked." In reference to the message she sent stating, "I've got men taking care of it," she said that she meant she had Larry Green stay with her for a few nights for safety and that Mr. Houser was going to "kick [the victim's] butt." She explained the text message stating, "My hands will stay clean. I'm making sure of it," was to keep the victim from finding out she had arranged an assault. She was concerned about retaliation should the victim learn she had instigated the assault.

The [Petitioner] testified that she and Mr. Houser stayed awake all Thursday night smoking methamphetamine. Early Friday morning, she received a text message from the victim. She said that Mr. Houser was aware of the text message and went outside. The victim was texting the [Petitioner] asking to have sex and watch pornography. He also referenced "pow wow," which she indicated was methamphetamine. While texting with the victim, the [Petitioner] was also texting with Mr. Houser to let him know the victim was coming over. The [Petitioner] was in the bathroom when she heard the victim's truck pull up. She then heard a "big smack" and the victim moan. She heard "more smacks" and "freaked out." She said she began crying and stayed in the bathroom because she did not know what to do.

The [Petitioner] testified that she knew Mr. Houser was going to beat up the victim but that the noise "sounded awful." Five minutes after she heard the noises, Mr. Houser came into the residence and told her he had taken "care of it." The [Petitioner] responded, "what did [you] do[?]" and "what ha[ve] you done?" Mr. Houser told her that he had done what she wanted and "it would be better off for [the Petitioner] and the kids." The [Petitioner] said that, at this point, she was very upset because Mr. Houser had "just killed [the victim]" and she "loved [the victim]."

The [Petitioner] testified that Mr. Houser left and then returned a second time. He told her to "get it together" and asked her to open the bathroom door. When she did, he shook her and again told her to "get it together." She stated that she did not leave the bathroom until after Mr. Houser had driven away. The [Petitioner] agreed that she still communicated with Mr. Houser after he left her residence. She denied leaving the house, helping Mr. Houser with the body, hosing down the yard, or giving Mr. Houser gas money. She agreed that she washed clothing Mr. Houser gave her because she was already doing a load of laundry and normally washed his clothing.

- 24 -

The [Petitioner] testified that Mr. Houser updated her on his route and what he was doing after he left her residence. He also checked to see if the [Petitioner] was "okay." He let her know when he had disposed of the body and the truck. On Friday night, Derek Peters brought Mr. Houser to the [Petitioner's] residence and Mr. Houser retrieved his clothing before leaving again. While he was at her house, Mr. Houser was "bragging" about "it." She said that Mr. Houser told her that she should have seen the victim "gurgling."

The [Petitioner] testified that Mr. Houser returned again on Saturday night. She said that she let him inside her home because she was afraid of him because he had "just killed my boyfriend." She said that she did not know his "mind frame," so she was not going to tell him no. While at her residence this time, Mr. Houser told her that she was just as complicit in the victim's murder as he. She said that she did not call the police because she was scared and thought it would not do any good. She said that Mr. Houser stayed with her for the rest of the following week. She said that he never left her alone during this time.

The [Petitioner] testified that Mr. Houser obtained a motorcycle on the day of their arrest at her residence. She said David Johnson drove her and Mr. Houser to get the motorcycle in West Point. When they returned to her residence, her children were at her house after returning home from school on the school bus.

On cross-examination, the [Petitioner] denied ever having seen Mr. Houser with a baseball bat while he was at her residence. The [Petitioner] stated that her bathroom was located at the far side of the residence from where the altercation took place and that there was no window in the bathroom. She could not explain how she could distinguish "smacking" sounds heard from inside the bathroom as "very serious" as opposed to the "smacking" sounds one might hear in the course of a normal fight as she had asked Mr. Houser to do. The [Petitioner] [stated] that she did not want the victim to get hurt, she merely wanted his "butt kicked." She agreed that she did not call 911 or notify authorities of what had occurred even after Mr. Houser left. She did, however, send a text message to Randy Flatt at around 6:00 or 6:30 a.m. asking if he would exchange Lortab for sex. She explained that she was "needing something" because she was crying and upset.

Based upon this evidence the jury convicted the [Petitioner] of first degree premeditated murder.

*Rachel Kay Bond*, 2016 WL 4548107 at *1-15.

## II. Post-conviction Proceedings

Trial counsel and the Petitioner testified during the post-conviction hearing. Trial counsel acknowledged that he and the Petitioner may have had conversations about her knowing potential jurors. Trial counsel was asked if he recalled the Petitioner raising a concern "when the jury was seated about somebody knowing her in the jury box." He could not recall the specifics of the discussion or the name of the Petitioner's acquaintance, but he agreed there was "probably some conversation" regarding a member of the jury being acquainted with her.

Trial counsel did not recall specifically discussing whether to move for a change of venue. Trial counsel explained that he did consider requesting a change of venue. He testified that he looked into the notoriety of the case by checking newspapers and that he "did not find anything of outstanding publicity during that time." Trial counsel did not feel it was necessary to change the venue in order to find twelve qualified jurors. On cross-examination, trial counsel stated that when making a decision about whether to request a change of venue, he considered how much time had passed between the offense and the trial and the publicity surrounding the trial. When discussing this particular case, trial counsel stated that at least one year had passed between the offense and the trial. He believed there had been one or two articles written, and he did not recall if the case received any television coverage. Trial counsel noted that the victim was not from Lawrence County. Trial counsel testified that there were a large number of prospective jurors in the venire and that he "felt fairly good" about the jury that was impaneled.

Trial counsel discussed his cross-examination of Mr. Houser regarding the agreement that the State had reached with Mr. Houser. Trial counsel did not believe the agreement influenced Mr. Houser's testimony. Trial counsel at first objected to Mr. Houser's agreement being entered into evidence, but he ultimately decided that putting the agreement before the jury would benefit the Petitioner because it would call into question Mr. Houser's motivations in testifying. Trial counsel also wanted to be able to cross-examine him about the agreement. Trial counsel stated that he did make several objections during Mr. Houser's testimony and that he tried to highlight the inconsistencies in his trial testimony compared to his statement to law enforcement.

Trial counsel acknowledged that he never retrieved the Petitioner's cell phone from evidence to see if the entire conversation between Ms. Lewis and the Petitioner was

- 26 -

still stored on the phone. He recalled that the Petitioner told him that she had deleted the text messages from her cell phone. Trial counsel never sought to subpoena the Petitioner's cell phone records from the cell phone company because he believed that the content of the text messages from the Petitioner's type of cell phone was not retrievable from her cell phone provider. The Petitioner's cell phone records, showing only the timing of telephone contact, were entered into evidence. Trial counsel testified that he attempted to exclude the text messages because they appeared inculpatory. However, based on his conversations with the Petitioner at the time of trial, he believed that the text message conversation would still have appeared inculpatory even if he had been able to obtain the messages Ms. Lewis sent during the conversation. On cross-examination, trial counsel discussed his numerous objections to the admission of the Petitioner's one-sided text message conversation with Ms. Lewis. Trial counsel objected pursuant to the rule of completeness because the entire conversation was not admitted, only the Petitioner's responses, which were void of any context. Trial counsel also raised this issue on direct appeal.

Trial counsel testified that the Petitioner made the decision to testify at trial to rebut both Ms. Lewis's testimony regarding the content of the text messages and Mr. Houser's testimony. On cross-examination, trial counsel stated that he had been an attorney for approximately twenty-one years. Since the time of the trial, he had transitioned from private practice to working as a public defender. Trial counsel stated that when he was in private practice, seventy-five to eighty-five percent of his cases were criminal cases. Trial counsel explained that it was his practice to always discuss whether a defendant wished to testify with that defendant. He stated that he always tried to discuss the advantages and disadvantages of testifying and to explain that the choice belonged to the defendant. Trial counsel advised the Petitioner to testify to rebut Ms. Lewis's testimony regarding the text messages and Mr. Houser's testimony regarding her knowledge of the crime. He believed that the text messages showed premeditation and that it was important for the Petitioner to explain them.

The Petitioner testified that she told trial counsel that she was concerned that people in the jury venire knew her. In particular, she was concerned about two women who worked in her doctor's office and had knowledge about her illegal drug use and one man who attended school with her when she was a child. The Petitioner recalled that trial counsel informed her that he did not have any peremptory strikes available to use to remove these jurors. The Petitioner did not name these jurors, and it is not entirely clear from her testimony whether they were selected for the jury. The prosecutor correctly noted that the trial transcript reflects that three or four members of the venire raised their hands to indicate that they were acquainted with the Petitioner, but the trial transcript does not indicate whether these prospective jurors were selected for the jury.

The Petitioner testified that she believed that a change of venue was necessary because the trial was taking place in a small town and because she thought that everyone in town knew Mr. Houser and the victim. She stated that trial counsel told her that he did not think that it was necessary, and that was the extent of their conversation about whether to request a change of venue. The Petitioner explained that she felt that a change of venue was necessary because the people whom she knew in the jury pool knew that she was a drug addict and she feared she would not receive a fair trial.

The Petitioner admitted that she did not recall specifically telling trial counsel that law enforcement had possession of her cell phone, but she assumed that he was aware of this information. She believed her cell phone was still stored in evidence. She could not recall whether she deleted the text message conversation with Ms. Lewis. However, she did not remember telling trial counsel that she deleted the messages from her cell phone.

The Petitioner stated that she wanted to testify because Mr. Houser's testimony was inconsistent with his prior statements to law enforcement. She felt that she needed "to tell the story" because Mr. Houser had "flip flop[ped]."

The post-conviction court entered a written order denying the Petitioner post-conviction relief. The post-conviction court made a general finding that the Petitioner's testimony was not credible either at trial or at the post-conviction hearing. The post-conviction court credited trial counsel's statements that he considered several factors before making the decision not to request a change of venue. Regarding trial counsel's decision not to strike jurors that the Petitioner testified that she knew, the post-conviction court found that trial counsel had used all eight peremptory challenges. The post-conviction court also noted that the Petitioner did not name the jurors nor did she testify that any of the three jurors served as members of the jury or whether they were simply in the venire. The post-conviction court credited trial counsel's testimony that he discussed the text message exchange between the Petitioner and Ms. Lewis which was stored on the Petitioner's phone. Trial counsel testified at the post-conviction hearing that he specifically recalled that the Petitioner told him that she had deleted those text messages. The post-conviction court noted in its order that it did not believe the Petitioner's testimony concerning the existence of the text messages on her cell phone. Further, the post-conviction court found that trial counsel effectively cross-examined all of the State's witnesses, and that trial counsel "knew every detail of the case and what to expect from each witness's testimony." The post-conviction court noted that the Petitioner testified during the post-conviction hearing that she wanted to testify at trial to rebut Mr. Houser's testimony. Accordingly, the post-conviction court found that each of the Petitioner's claims were without merit and denied her post-conviction relief. The Petitioner now appeals.

- 28 -

**ANALYSIS**

The Petitioner maintains that trial counsel was ineffective for six reasons: 1) failure to file a motion for change of venue; 2) failure to challenge three jurors; 3) failure to investigate; 4) failure to adequately cross-examine Mr. Houser; 5) advising the Petitioner to testify at trial; and 6) failure to discuss the Petitioner's mental state. The State argues that the post-conviction court properly denied the Petitioner post-conviction relief. We agree with the State.

A petitioner is entitled to post-conviction relief from any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. The petitioner has the burden of proving the allegations of fact in the petition by clear and convincing evidence. T.C.A. § 40-30-110(f); *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). A claim of ineffective assistance of counsel is a mixed question of law and fact. *Calvert v. State*, 342 S.W.3d 477, 485 (Tenn. 2011). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against them. Tenn. R. App. P 13(d); *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009). An appellate court reviews de novo with no presumption of correctness the post-conviction court's conclusions of law. *Mobley v. State*, 397 S.W.3d 70, 80 (Tenn. 2013).

A person accused of a crime is entitled to the assistance of counsel in criminal proceedings under the Sixth Amendment to the United States Constitution and under article I, section 9 of the Tennessee Constitution. These provisions guarantee the reasonably effective assistance of counsel. *Nesbit v. State*, 452 S.W.3d 779, 786 (Tenn. 2014). The deprivation of this right is a cognizable claim under the Post-Conviction Procedure Act. *Moore v. State*, 485 S.W.3d 411, 418 (Tenn. 2016). To prevail on such a claim, the petitioner must show that trial counsel's representation "'so undermined the proper function of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)).

To establish an ineffective assistance of a counsel claim, the petitioner "must show that counsel's performance was deficient and that the deficiency prejudiced the defense." *Wiley v. State*, 183 S.W.3d 317, 329 (Tenn. 2006) (citing *Strickland* at 466 U.S. 692; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996)). This court "need not address both elements if the petitioner fails to demonstrate either one of them." *Kendrick*, 454 S.W.3d at 457. To establish deficiency, the petitioner is required to show that trial counsel's

actions "fell below an objective standard of reasonableness under prevailing professional norms." *Wiley*, 183 S.W.3d at 329. Trial counsel's performance is not deficient when the advice given is "within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In order to establish prejudice as a result of trial counsel's deficient performance, the petitioner "'must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different.'" *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (quoting *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006)).

## I. Change of Venue

The Petitioner maintains that trial counsel was ineffective by failing to request a change of venue prior to trial. The State responds that the Petitioner has failed to overcome the strong presumption that trial counsel exercised reasonable judgment when making the strategic decision not to request a change of venue.

A change of venue may be granted when it appears that because of "undue excitement against the defendant in that county where the offense was committed or any other cause, a fair trial probably could not be had." Tenn. R. Crim. P. 21(a). A change of venue is not warranted just because potential jurors have been exposed to pretrial publicity. *State v. Mann*, 959 S.W.2d 503, 531-32 (Tenn. 1997). This court has determined that jurors "can have knowledge of the facts surrounding the crime and still be qualified to sit on the jury." *State v. Crenshaw*, 64 S.W.3d 374, 386 (Tenn. Crim. App. 2001) (citing *State v. Bates*, 804 S.W.2d 868, 877 (Tenn. 1991)). "Prejudice will not be presumed by a mere showing that there was considerable publicity." *Keith Whited v. State*, No. M2012-02294-CCA-R3-PC, 2014 WL 1832962, at *12 (Tenn. Crim. App. May 7, 2014) (citing *Dobbert v. Florida*, 432 U.S. 282, 303 (1977)). A petitioner must prove that trial counsel's failure to request a change of venue was prejudicial to her defense. *See William Darryn Busby v. State*, No. M2010-00709-CCA-R3-PC, 2013 WL 5873276, at *16 (Tenn. Crim. App. Oct. 30, 2013).

Trial counsel testified at the post-conviction hearing that he did not request a change of venue because his investigation revealed there was little publicity surrounding the case at the time of the trial. Further, trial counsel testified that he did not think a request for a change of venue would have been granted. He also did not believe that a change of venue was necessary to find twelve unbiased jurors. The post-conviction court credited trial counsel's testimony that he considered filing a motion for a change of venue, but after further researching the issue, he made the strategic decision against it. *See id.* (upholding the post-conviction court's ruling that trial counsel's strategic decision to forego seeking a change in venue was not deficient). The Petitioner has failed to present proof that the jury was biased. Further, she has failed to present any evidence

that if trial counsel had requested a change of venue, it would have been granted. Accordingly, the Petitioner is not entitled to relief regarding this issue.

## II. Failure to Strike Potential Jurors

The Petitioner asserts that trial counsel was ineffective for failing to strike three jurors who were acquainted with her. Trial counsel acknowledged that he and the Petitioner had some discussion about a juror in the jury box who was acquainted with the Petitioner. Nevertheless, we conclude that the Petitioner has not established that trial counsel was deficient in striking the juror or that her right to an impartial jury was violated.

Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the right to a trial by an impartial jury. "An unbiased and impartial jury is one that begins the trial with an impartial frame of mind, that is influenced only by the competent evidence admitted during the trial, and that bases its verdict on that evidence." *State v. Smith*, 418 S.W.3d 38, 45 (Tenn. 2013) (citing *State v. Adams*, 405 S.W.3d 641, 650-51 (Tenn. 2013); *Durham v. State*, 188 S.W.2d 555, 558 (Tenn. 1945)). The defendant has the burden of establishing a prima facie case of bias or partiality. *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993).

Counsel's full knowledge of the facts that might bear upon a juror's qualifications is essential to the intelligent exercise of peremptory and cause challenges. *Id.* A prior relationship with a witness or party does not automatically disqualify a juror. *Hugueley*, 185 S.W.3d 356, 379 (Tenn. 2006); *see State v. Christopher K. Knight*, No. W2001-02995-CCA-R3-CD, 2003 WL 721701, at *2 (Tenn. Crim. App. Feb. 27, 2003) (concluding that a juror's casual acquaintance with the victim did not establish bias and that bias could not be presumed because relationship was not elicited during voir dire); *Bowman v. State*, 598 S.W.2d 809, 812 (Tenn. Crim. App. 1980) (concluding that a juror was not disqualified because there was no proof of bias or inherent prejudice despite an acknowledged social relationship with the Assistant District Attorney who was ultimately called as a rebuttal witness). In raising a claim of ineffective assistance of counsel with regard to failure to strike a biased juror, the petitioner must show that the juror was actually biased. *Smith v. State*, 357 S.W.3d 322, 348 (Tenn. 2011) (citing *Miller v. Webb*, 385 F.3d 666, 674 (6th Cir. 2004)).

In this case, the record from trial reflects that three or four members of the venire raised their hands to indicate that they were acquainted with the Petitioner. The rest of voir dire was not transcribed or included in the record on direct appeal. The Petitioner testified that she knew one potential juror from when she was a child and that two other jurors worked at her doctor's office. Trial counsel acknowledged that there was

"probably some conversation" about a juror who was acquainted with the Petitioner. The record reflects that the potential jurors acknowledged their relationship with the Petitioner, and the Petitioner has presented no evidence to establish a prima facie case of bias. Apparently, both the trial court and trial counsel were satisfied that the jurors seated on the jury were able to render an impartial verdict. Because the Petitioner has not shown that the jurors who were impaneled harbored bias, she has failed to establish that trial counsel was deficient in failing to strike any particular juror. *See Smith*, 357 S.W.3d at 348.

### III. Failure to Investigate

On appeal, the Petitioner maintains that trial counsel was ineffective for failing to investigate whether the entire text message conversation between the Petitioner and Ms. Lewis was stored on the Petitioner's cell phone. The post-conviction court credited trial counsel's testimony that the Petitioner had informed him that she deleted the text message conversation. Trial counsel has a duty to make reasonable investigations. *See Baxter*, 523 S.W.2d at 933. However, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691. Accordingly, the Petitioner has not proven that trial counsel was deficient in failing to investigate. Further, the Petitioner failed to present any evidence that the text messages were present on her telephone at the time of trial or what the messages would show. Trial counsel testified that his conversation with the Petitioner led him to believe that having both sides of the conversation would not prove exculpatory. Therefore, we conclude that the Petitioner cannot establish prejudice. *See State v. Black*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1999).

### IV. The Cross-Examination of Mr. Houser

The Petitioner argues that trial counsel was ineffective for failing to adequately cross-examine Mr. Houser about the agreement that he had reached with the State in exchange for his testimony. Specifically, the Petitioner asserts that trial counsel erred in allowing Mr. Houser's agreement to be entered into evidence. The Petitioner suggests that by allowing the agreement into evidence, trial counsel "subjectively agreed that Mr. Houser would be telling the truth" during his testimony. The State maintains that the Petitioner has failed to prove that the proffer was not admissible.

Trial counsel's decision regarding whether to cross-examine a witness regarding an issue "is a strategical or tactical choice, if informed and based on adequate preparation." *Lawrence Warren Pierce v. State*, No. M2005-02565-CCA-R3-PC, 2007 WL 189392, at *7 (Tenn. Crim. App. Jan. 23, 2007) (citing *Hellard v. State*, 629 S.W.2d

4, 9 (Tenn. 1982)). "[S]trategic decisions during cross-examination are judged from counsel's perspective at the point of time they were made in light of the facts and circumstances at that time." *Johnnie W. Reeves v. State*, No. M2004-02642-CCA-R3-PC, 2006 WL 360380, at \*10 (Tenn. Crim. App. Feb. 16, 2006) (citing *Strickland*, 466 U.S. at 690).

Trial counsel testified that he chose not to object to the admissibility of the agreement because he wanted to use it to cross-examine Mr. Houser and because he felt that the admission of the document would overall be beneficial to the Petitioner by raising questions about Mr. Houser's motivations in testifying. In denying post-conviction relief, the post-conviction court found that trial counsel's cross-examination of Mr. Houser was "through and effective." We will not second guess trial counsel's strategic decision to introduce the terms of the proffer agreement during his cross-examination of Mr. Houser. *See Hellard*, 629 S.W.2d at 9. Accordingly, the Petitioner is not entitled to relief.

## V. Advising the Petitioner to Testify at Trial

The Petitioner argues that trial counsel was ineffective for advising her to testify at trial. She further states that trial counsel's other alleged errors with regard to the text messages and the contents of the State's proffer forced her to testify. The Petitioner and trial counsel agreed that trial counsel advised her to testify, but the Petitioner does not allege that she was coerced into testifying. During the post-conviction hearing, the Petitioner testified that she felt that it was necessary to testify to rebut Mr. Houser's testimony. Further, the Petitioner stated that she "did feel like I needed to tell the story."

The trial court conducted a jury-out hearing prior to the Petitioner's testimony at trial. During that hearing, she acknowledged that she freely and voluntarily made the decision to testify. Trial counsel stated that he advised the Petitioner to testify because the text messages implied that the Petitioner had asked for help in the victim's murder and because there was no other way to introduce her version of events. The Petitioner has failed to show how trial counsel's advice that she testify amounted to deficient performance. *See Andrew Mann v. State*, No. E2014-01524-CCA-R3-PC, 2015 WL 3643473, at \*5-6 (Tenn. Crim. App. June 12, 2015) (rejecting the petitioner's claim that trial counsel was ineffective for advising him to testify at trial when the petitioner testified at the post-conviction hearing that it was his decision to testify).

## VI. The Petitioner's Competency at Trial

The Petitioner contends that trial counsel was ineffective for failing to discuss her competency prior to trial. The State maintains that the Petitioner failed to provide any

evidence to support this claim. We agree with the post-conviction court that the Petitioner has failed to establish either deficiency or prejudice in counsel's failing to request a mental evaluation. *See Frank E. Huey v. State*, No. M2005-01490-CCA-R3-PC, 2007 WL 258438, at *3 (Tenn. Crim. App. Jan. 30, 2007) (rejecting the petitioner's claim that trial counsel was ineffective for failing to have a competency evaluation when the petitioner failed to present any evidence during post-conviction that he was not competent to testify).

## CONCLUSION

Based on the foregoing, we affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE